FILED
2019 Feb-07  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# IN THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **ex rel. ERIN HORSLEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.:** |
| **vs.** | ) | |
| | ) | |
| **COMFORT CARE HOME** | ) | **FILED UNDER SEAL** |
| **HEALTH;** | ) | **PURSUANT TO** |
| **WOODLAND HOME HEALTH** | ) | **31 U.S.C. § 3730(b)(2)** |
| **SERVICES-CRMC, LL d/b/a** | ) | |
| **COMFORT CARE HOME** | ) | |
| **HEALTH;** | ) | |
| **TRILOGY PHYSICIAN SERVICES,** | ) | |
| **LLC;** | ) | |
| **ALAN STEWART, in his official and** | ) | |
| **individual capacity;** | ) | |
| **JONATHAN JAMES, in his official** | ) | |
| **and individual capacity;** | ) | |
| **STEVEN CARMEN; in his official** | | |
| **and individual capacity;** | | |

**Defendants.**

## <u>COMPLAINT</u>

Plaintiff-Relator Erin Horsley (hereinafter "Relator"), through her attorney, Scott Morro, on behalf of the United States Government (the "Government" or the "Federal Government"), and files this Complaint against Defendants Comfort Care Home Health Services, LLC, Woodland Home Health Services-CRMC, LLC d/b/a Comfort Care Home Health Services, LLC, Trilogy Physician Services, LLC, Alan

Stewart, in his official and individual capacity, Jonathan James, in his official and individual capacity, and Steven Carmen, in his official and individual capacity, (collectively "Defendants"). As grounds for this action, Relator alleges, based on personal knowledge, information and belief, as follows:

## **INTRODUCTION**

1.     This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and caused to be made by Defendants and/or its agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("the FCA").

2.     Upon information and belief, Defendants Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health presented and caused to be submitted false and fraudulent records, statements, and Medicare claims for payment to the U.S. Government. Defendants engaged in a pervasive pattern of submitting false and fraudulent records and claims for Medicare reimbursements by: (a) upcoding the severity of a patient's medical condition in order to bill Medicare for more extensive and expensive services; (b) providing home health and therapy services to patients without any medical necessity; (c) retaining patients absent any medical necessity for further home health care services; (d) falsifying and forging records submitted to Medicare; (e) failing to

refund/non-bill amounts paid by Medicare for services not rendered once discovered; (f) unlawfully referring patients to GAP medical service company in which Defendant has a personal financial interest; and (g) threatening and intimidating employees to further said fraudulent activities.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

4.     Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because the Defendant can be found in and/or transacts or has transacted business in this District and the actions that gave rise to this action arose in this jurisdiction.

## PARTIES

5.  Plaintiff-Relator Erin Horsley ("Relator") is an adult citizen of the United States and resident of the State of Alabama. Relator is a licensed nurse in the State of Alabama. Relator is a former employee of Defendants whose positions at Comfort Care Home Health included Baylor RN, Weekday Admissions Nurse, and Patient Care Coordinator. Relator immediately became aware that Defendants' business practices are designed to fraudulently maximize billing to the United States by falsely representing the type and severity of patients' medical conditions.

Relator communicated her concerns to her superiors at Comfort Care Home Health including COO Alan Stewart and Administrator Jon James. She was met with hostility and intimidation. Relator has witnessed numerous instances in which Comfort Care Home Health has fraudulently inflated its Medicare billing to the United States and in which Comfort Care Home Health billed Medicare for patients whom it knew were not homebound and did not qualify for the Medicare home health benefit. Through her experience, Relator has become convinced that Defendants' fraudulent schemes represent widespread systematic practices by Comfort Care Home Health and Woodland Home Health. Defendants' conduct is offensive to Relator as a dedicated healthcare professional. Accordingly, Relator has filed this action as original-source relator under the qui tam provisions of the False Claims Act. Relator has served upon the United States a written disclosure of the material evidence upon which her claims are based.

6.     Defendant, Comfort Care Home Health Services, LLC ("Comfort Care") is an Alabama limited liability company with its principal place of business at 245 Cahaba Valley Parkway Ste 200 Pelham, AL 35124. The Comfort Care Home Health Services, LLC located at 1900 Cherokee Ave SW Cullman, AL 35055 provides home health services in the Cullman County, Alabama and surrounding areas. Relator's employment was mostly with the Cullman County office.

7.     Defendant   Woodland   Home   Health   Services-CRMC,   LLC ("Woodland") is an Alabama limited liability company doing business as Comfort Care Home Health Services, LLC with its principal place of business at 2035 AL HWY 157 Cullman, AL 35058. Woodland Home Health provides home health services in the Cullman County, Alabama and surrounding areas. Woodland Home Health was purchased by Comfort Care Home Health Services, LLC.

8.     Defendant Trilogy Physician Services, LLC ("Trilogy") is an Alabama limited liability company whose principal place of business is at 1281 Abercrombie Road, Centreville, Alabama. Defendant Alan Stewart and his wife were the previous owners of Trilogy Physician Services, LLC. Trilogy was purchased by Defendant Comfort Care at an unknown time. Trilogy remains in operation as a gap coverage provider for patients who do not have a primary care physician and who cannot physically make it to a doctor's office. Trilogy is designed to be a short-term solution for patients who are homebound and do not have primary care physician.

9.     Defendant Alan Stewart is the COO of Comfort Care Home Health Services, LLC, and has been at all times relevant to this Complaint.

10.     Defendant Steven Carmen is the Regional Administrator for Comfort Care Home Health Services, LLC, and has been at all times relevant to this Complaint.

11.    Defendant Jonathan James ("Jon") is the Administrator of the Cullman Office for Comfort Care Home Health Services, LLC, and has been at all times relevant to this Complaint.

## LEGAL BACKGROUND

## FALSE CLAIMS ACT

12.    The False Claims Act ("FCA") prohibits knowingly presenting, or causing to be presented, to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1) (1986) and 31 U.S.C. § 3729(a)(1)(A) (2009). In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B). The FCA further prohibits knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money back to the federal government. 31 U.S.C. § 3729(a)(1)(G).

13.    The term "knowingly" under the FCA means that a person, with respect to information, (i) has actual knowledge of the information, (ii) acts in deliberate ignorance of the truth or falsity of the information, or (iii) acts in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b). No proof of specific intent to defraud is required to show that a person acted knowingly under the FCA. *Id.*

14.     Violations of the FCA subject the defendant to civil penalties of not less than $5,500 and not more than $11,000 per false claim, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions. 31 U.S.C. § 3729(a).

## MEDICARE PAYMENT FOR HOME HEALTH SERVICES

15.     Under Medicare, the United States pays for certain home health services rendered to Medicare beneficiaries who meet specific coverage requirements. 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A). Services covered under this benefit include part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health aide services, and medical social services. 42 U.S.C. § 1395x(m).

16.     Medicare will pay for home health services only if a physician certifies that:

(1) the patient needs skilled nursing care, speech-language pathology, or physical or occupational therapy;

(2) the patient is confined to the home ("homebound"); and

(3) a plan of care has been established by and is periodically reviewed by a physician.

42 C.F.R. § 424.22; 42 C.F.R. §§ 409.41, 409.42. The physician must re-certify that these conditions exist, and re-certify a plan of care for the patient, at

least once every sixty days if the home health agency wishes to submit further claims to Medicare for additional episodes of care. *Id.*

17.   "Homebound" means that the patient is normally unable to leave his home under his own power without a severe or taxing effort. Medicare Benefit Policy Manual 100-02 ("Manual"), Chapter 7, Section 30.1.1.

18.   To be covered by Medicare, a home health agency's skilled nursing services must be reasonable and necessary to the treatment of the patient's condition, and they must be intermittent. Manual, Chapter 7, Section 40.1.

19.   Where other requirements are met, Medicare covers skilled therapy services provided in the home. "The service of a physical therapist, speech-language pathologist, or occupational therapist is a skilled therapy service if the inherent complexity of the service is such that it can be performed safely and/or effectively only by or under the general supervision of a skilled therapist. To be covered, the skilled services must also be reasonable and necessary to the treatment of the patient's illness or injury or to the restoration or maintenance of function affected by the patient's illness or injury." Manual, Chapter 7, Section 40.2.1.

20.   Throughout the relevant period, Medicare has paid home health providers under what is known as the Prospective Payment System ("PPS").

21.   Medicare payments under PPS are based upon sixty-day "episodes" of care. The PPS rate is intended to reimburse the home health agency for all

reasonable and necessary nursing and therapy services, routine and non-routine medical supplies, and home health aide and medical social services required for the care of an individual patient during that sixty days. The amount of the payment for each sixty-day episode of care is adjusted to account for the patient's health condition, clinical characteristics, and service needs.

22.    The adjustment in payment for the patient's health condition, clinical characteristics, and service needs is known as the case-mix adjustment. CMS has currently established eighty (80) case-mix groups, or Home Health Resource Groups ("HHRGs"), in which to classify patients for payment purposes.

23.    At the beginning of each sixty-day episode of care, the home health agency assesses the patient's condition and likely need for skilled nursing care or therapy using an instrument called the Outcome and Assessment Information Set, or OASIS. The OASIS contains certain data elements designed to assess a patient's "clinical severity domain," "functional status domain," and "service utilization domain." Each data element is assigned a score value. The HHRG in which the patient falls, and the Health Insurance Prospective Payment System ("HIPPS") code used to determine the home health agency's payment amount, is determined by summing the score values reflected on the OASIS.

24.    CMS contracts with regional home health intermediaries ("Intermediaries") to assist in the administration of home health claims processing

and payment. Home health providers submit claims for payment from Medicare to these Intermediaries.

25.    For initial episodes of care, Medicare pays 60% of the estimated payment for the sixty-day episode of care as soon as the Intermediary receives the home health provider's initial claim. The estimated payment is based upon the patient's HHRG, which, as described above, is derived from the OASIS. The residual 40% of the payment is made at the close of the sixty-day episode, unless there is some applicable adjustment to the payment amount. For subsequent episodes of care, the initial and residual payments are split evenly.

26.    One potential adjustment to the Medicare payment occurs when a patient is visited four or fewer times by the home health agency during the 60-day episode of care. This results in a reduction in payment known as a low-utilization payment adjustment, or LUPA.

27.    Additionally, if the home health provider fails to meet certain "therapy thresholds" in its treatment of a given patient, an adjustment may occur and result in a reduced payment to the home health provider. During the relevant period, for episodes beginning before January 1, 2008, the "therapy threshold" was ten therapy visits within an episode of care. By providing ten or more therapy visits, the home health agency could use a different HIPPS code on the claim for payment that would result in a higher payment amount from Medicare. For

episodes beginning on or after January 1, 2008, CMS adopted a three-tiered "therapy threshold" structure that based payments upon the patient's receipt of six, fourteen, or twenty therapy visits within an episode of care. Thus, it is financially advantageous for a home health agency like NR to provide at least five visits to a patient, and/or to meet certain therapy thresholds, within an episode of care.

28.    After the sixty-day episode of care has concluded, a patient may be re-certified for an additional sixty-day period or periods of care, provided that such home health care remains reasonable and necessary to the treatment of the patient's condition and otherwise meets Medicare's coverage rules.

29.    "Adjacent episodes" are defined by CMS as episodes of home health care with less than sixty days separating the last day of the first episode and the first day of the subsequent episode. For example, if a patient's initial episode of care ended on July 1, 2010, and his next episode of care commenced on any date prior to August 30, 2010, the two episodes would be considered "adjacent."

## FACTS

### FALSIFYING CHECK-IN ORDERS

30.    As stated above, for initial episodes of care, Medicare pays 60% of the estimated payment for the sixty-day episode of care as soon as the Intermediary receives the home health provider's initial claim, also known as Request for Anticipated Payment, or "RAP." To receive the RAP orders must be signed by the

patient's' physician and returned to Medicare. If the provider was unable to secure the signed and returned order, the RAP would cancel, and Medicare would take back the money initially paid out. If an agency routinely had their RAPs cancelled, they would lose their ability to submit RAPs to Medicare and would have to wait to bill at the end of the episode for all patients.

31.     During Relator's employment with Comfort Care, she became familiar with the manner in which Defendants "checked-in" new orders. Defendants routinely and systematically falsified new orders as signed and returned when they, in fact, were not. The falsified orders would then be submitted to Medicare for RAP payments in an effort to continue to have the ability to request RAP payments and maximize profitability.

## UPCODING PATIENTS

32.     During Relator's period of employment with Comfort Care Home Health, she became familiar with the method and the manner in which Defendants processed Medicare billing reports using the OASIS system. Throughout her various positions, she continuously had responsibilities related to the completion of OASIS reports on behalf of Defendants.

33.     Relator discovered that the procedure used by Defendants to process OASIS reports was intended to increase and maximize the profitability of Defendants, and not for the purpose of providing true and accurate information to

the Government for processing Medicare Claims.

34.     During the Relator's employment with Defendants, and presumably continuing after the Relator's departure, employees at Defendants were directed and required to follow, under threat of termination, a continuous and pervasive pattern of reporting information for Medicare billing purposes in a method that falsely inflated the severity of the patient's medical condition and need for home health services. This practice is otherwise known as "upcoding."

35.     To understand these patterns of upcoding, it is necessary to fully understand the process of seeking Medicare reimbursements for home health care services. The initial assessment visit was typically conducted and recorded by field nurses or therapists based on that nurse's clinical experience and observations of the patient. The patient's physical condition would be assessed and Nursing Notes (or Therapy Notes) and an OASIS report would be completed by the field nurse. These reports, to the best of the Relator's knowledge, were generally done accurately by the field nurses and therapists.

36.     Once the visiting nurse or therapist submitted the OASIS, the OASIS would then be reviewed by the Patient Care Coordinator ("PCC"). Relator held this position with Comfort Care. The PCCs were instructed through intimidation by Defendant Jon James to upcode and change the answers.

37.     Thereafter, the data entered would be transferred to a coder within the

company. The coders reviewed the data to ensure that it was inserted into the OASIS program correctly. If the coder found that any of the patterns of upcoding could be used, the coder instructed the field nurse or therapist to change the OASIS report in order to increase the HHRG point value. The coder would make further changes and send back to the field nurse or therapist to review. The coder would instruct the nurse or therapist to review the OASIS, with the statement "if you agree to the changes, sign and return." However, if they did not agree to the changes and changed the answers back to their original assessment, the coders would send back to them to over and over until they "agreed" to the changes.

38.     These changes were made without communicating with the patient, or the field nurse who assessed the patient. The coder would indicate, without contacting the individual making the medical assessment or the patient, that the patient's condition was worse than indicated in the Nursing Notes and in the OASIS report. These changes were ordinarily communicated by the coder to the case manager via email, however, they were also done occasionally by telephone.

39.     At times, Jon James would change OASIS answers and submit to Medicare himself to avoid having to notify the nurse or therapist.

40.     The practice of upcoding was not limited to only describing the level of pain the patient was in, but also included frequency of dyspea, bathing ability, transferring ability, ability to ambulate, and management of oral medications, all of

which are Quality Measures monitored by Medicare and provides the opportunity to increase reimbursement by the measure of the patient's severity. Such measures are reviewed by Medicare to determine the agency's STAR rating.

41.    Relator had direct knowledge of these practices of upcoding in her roles at Comfort Care. Relator was instructed by her superiors on repeated occasions to increase the level of severity of patients' conditions and to falsify the level of care the patient required. Relator was instructed by various coders, Alan Stewart, and Jon James to perform these practices of upcoding.

42.    Relator objected to the upcoding practices internally to Alan Stewart and Jon James on numerous occasions. Relator and others were continuously threatened with punishment and/or termination if they did not participate in the practice of upcoding patients. Relator would frequently compare the data entered into OASIS to the medical records created by the field nurse or therapist conducting assessments on the patients. In the course of comparing records, Relator discovered that Defendants were frequently upcoding the patient's condition. Comfort Care did not make any attempt to correct these patterns of upcoding.

43.    After voicing her objections to these practices, Relator was brought into a closed office by Alan Stewart and Jon James and threatened and intimidated into continuing said practices. This was an extremely hostile encounter and Relator

feared for her personal safety. To the best of Relator's knowledge, Defendants regularly coerced and intimidated other employees regarding fraudulent activities.

## LACK OF MEDICAL NECESSITY FOR HOME HEALTH SERVICES

44.     Comfort Care regularly provides patients therapy services without any medical necessity or justification for these services. This fraudulent activity of providing unnecessary therapeutic services occurs on two levels. At the first level, Comfort Care begins providing therapeutic services to patients who have no medical need for the services by falsifying the level of care the patient needed. On the second level, Comfort Care would continue providing therapeutic services to patients even if services were no longer needed, in an effort to increase profits and payments from Medicare.

### Level 1: Commencing Unnecessary Therapy Services

45.     As mentioned above, Comfort Care follows a persistent pattern of falsifying a patient's frequency of pain. By upcoding the patient's pain indicator, Comfort Care receives increased Medicare reimbursements. However, the improper benefits to Comfort Care of inflating a patient's pain also extends to therapeutic services.

46.     The pain inflation created a domino effect. Comfort Care's records should indicate that they are carrying a high patient census with pain because of the upcoding practices. For each patient with pain, regardless if the pain was

authentic or fabricated through upcoding, Comfort Care urges these patients to receive therapeutic services by having employees of Comfort Care contact the patient in order to sell the patient on therapeutic services.

Level 2: Continuing Unnecessary Therapy Services

47.    Under the HH PPS, if a patient is diagnosed with the need for home therapy services, then Medicare will make a payment to the HHA under the presumption that 10 therapy sessions will be provided to the patient during the 60-day episode of care.

48.    If 10 therapy sessions are not provided to the patient during the 60-day episode of care, then Medicare will retract payments to the HHA under LUPA

49.    These therapy sessions are only to be provided to the patient on an as-needed basis. Therefore, the therapy services are required to stop once the patient no longer had a medical need for the therapy services, regardless whether the patient received 10 therapy visits or less during the 60-day period.

50.    Comfort Care has instituted a system to ensure that any patient who received therapy services receives at least 10 but no more than 16 therapy visits per episode regardless of the patient's need in order to prevent the retraction of payments. Comfort Care instructs nurses and therapists to make at least 10 to 16 therapy visits, regardless of need. Defendants, and especially Jon James, would regularly hold therapist meetings in which this threshold requirement would be

communicated under threat and intimidation. Relator was present and countless meetings of this type and witnessed the pervasive intimidation of nurses and therapists to meet the threshold for visits regardless of medical necessity.

**LACK OF MEDICAL NECESSITY FOR RECERTIFICATIONS**

51.     Defendants have instituted a routine, pervasive and persistent pattern and practice of improperly refusing to discharge patients from its care.

52.     Under the procedures, Defendants reviewed the patient's record after a patient received the initial 60-day episode of care to determine if the patient was eligible for discharge. If the patient was determined by Defendants to be ineligible for discharge and in need of continued home care, the patient was recertified, and Defendants would continue to seek and receive reimbursements from Medicare with respect to the patient.

53.     Defendants would follow this consistent pattern of improperly refusing to discharge patients and would attempt to incorporate any possible factual scenario for recertification. Defendants would rely on the very slightest of a change in circumstance to justify refusing discharge.

54.     Further, Relator was informed by Jon James that the previous Administrator of the Comfort Care Cullman Office, Stephen Campbell, was removed from the position due to falsifying and forging recertifications. During that time, Stephen Campbell, in the absence of a validly physician signed

recertification, would simply clip the signature from the start of care order and tape the signature to a recertification to be submitted to Medicare. It is unknown at this time exactly how long this practice continued, however, to the best of Realator's knowledge, Defendants took no steps to repay or refund these payments and instead retained the funds. Thomas was transferred to a new position as a coder with Comfort Care.

55.     Discharges were continuously denied and recertifications granted by Defendants without regard to the medical necessity of these recertifications.

56.     However, due to the upcoding the patient's severity as described above, if a patient were to be discharged because of factors the Defendants could not control, the patient's records would reflect that the patient made a tremendous, almost unbelievable recovery within the episode of care. Defendants' records will not accurately reflect the true medical diagnosis or condition of each patient because of the systematic manipulation of OASIS reports. This was done to maintain and inflate the Defendants' future star rating with Medicare for the year 2020.

57.     Defendants retain many of their patients for an unusually high number of 60-day plans of care. It is not unusual to see patients undergo 6 continuous 60-day plans of care, with some patients who received 10 or more recertifications.

58.      The purpose of the above described behavior is to maximize the

payments Defendants would receive from Medicare without any regard to the medical necessity of the treatments.

## UNLAWFUL SELF-DEALING AND DOUBLE DIPPING

59.   Defendant Trilogy Physician Services, LLC provides services to patients that have been recently discharged from the hospital or have just been referred to home health by the patient's primary care physician. The COO of Comfort Care, Alan Stewart, and his wife were originally the owners of Trilogy.

60.   Trilogy's services are completely separate from that of Comfort Care in that Trilogy's services are designed to be a temporary gap coverage for patients that are not physically able to attend doctor's appointments. Patients must give their informed consent before being referred to Trilogy for such services.

61.   However, every patient that was referred to Comfort Care Home Health and/or Woodland Home Health by a physician or hospital were, in addition, automatically referred to Trilogy, regardless of medical necessity or patient consent. This was originally done to build up Trilogy's client base while the COO of Comfort Care, Alan Stewart and his wife were the owners of Trilogy, and to maximize the amount of billing to Medicare Trilogy can perform.

62.   At an unknown later time, Trilogy was purchased by Comfort Care. Alan Stewart is still the CEO of Trilogy.

63.   Upon information and belief, a substantial majority of the patients

referred to Trilogy by Comfort Care and Woodland are done so without any medical necessity and without the consent of the patient.

64.    Relator objected to this practice on numerous occasions. Relator was continuously intimidated by Alan Stewart and Jon James to continue to refer every Comfort Care patient to Trilogy. Comfort Care's COO, Alan Stewart, stands to personally gain financially by this practice. A substantial majority of the claims submitted to Medicare by Trilogy would not have been possible but for the improper referrals by Comfort Care.

## BILLING MEDICARE FOR SERVICE NOT ACTUALLY PERFORMED

65.    Relator has knowledge of facts surrounding a previous employee of Comfort Care that was discharged for billing for therapy visits that never occurred.

66.    Yvonne, last name unknown (nicknamed "Bama") was an LPN with Comfort Care from on or about February 2015 until October 2016. Yvonne transferred to the Cullman office of Comfort Care on or about January 2016.

67.    Upon information and belief, it was discovered that Yvonne routinely billed, and Medicare paid for services and visit that were never rendered. Yvonne was ultimately discharged for this behavior.

68.    However, after investigation by Comfort Care, it was determined by Comfort Care that the amount of fraudulent billing by Yvonne that was submitted to Medicare was too great and efforts by Comfort Care to return all fraudulent

Medicare payments were abandoned. It is unknown if any payments were returned to Medicare for these false visits. Upon information and belief, Comfort Care only non-billed and/or returned payments to Medicare for one week's worth of Yvonne's visits/services, despite the actual billing being over the course of several months to one year.

## COUNT I

## VIOLATIONS OF THE FEDERAL
## FALSE CLAIMS ACT 31 U.S.C. §§ 3729(a)(1) and (a)(2)

69.     Relator realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

70.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

71.     By virtue of the acts described above, Defendants Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health, by and through its officers, agents, supervisors and employees, knowingly presented or caused to be presented false or fraudulent claims to the United States Government for payment or approval in violation of 31 U.S.C. § 3729(a)(1).

72.     By virtue of the acts described above, Defendants Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health, by and through its officers, agents, supervisors and employees, knowingly made, or caused to be made or used false records and statements, and omitted material facts,

with the knowledge and intent to induce the Government to approve and pay false and fraudulent claims in violation of U.S.C. §3729(a)(2).

73.    Defendants Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health, by and through its officers, agents, supervisors and employees, authorized the various officers, agents, supervisors and employees to take the actions described above.

74.    Because of Defendants' actions, Relator was denied the benefit of working for an honest employer, experienced the embarrassment of working for and with a company that committed fraud against the U.S. Government and suffered stress, anxiety and mental anguish, which contributed to the constructive termination of Relator's employment.

75.    Each claim that was filed or submitted by Defendants to a Federal health care insurance program which was impacted or affected by Defendants' fraudulent practices described herein represents a false or fraudulent claim presented to the U.S. Government for payment or approval in violation of violation of U.S.C. § 3729(a)(1).

76.    Each record or statement created as a result of, or affected by, Defendants' fraudulent practices described herein represents a false record or statement made or used by Defendants to induce the Government approve and pay false claims in violation of U.S.C. § 3729(a)(2).

77.     Relator cannot at this time identify all of the false claims for payment that resulted from Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health's conduct. The false claims were ·prepared by various employees and/or agents of Comfort Care Home Health and Woodland Home Health d/b/a Comfort Care Home Health over a period of many years. Relator has no control over the activities of those employees and/or agents and currently have no access to the records in Defendants' possession.

78.     However, Relator estimates that Federal health insurance programs have paid hundreds of thousands of dollars in claims as a result of the false or fraudulent claims submitted by the Defendants.

79.     The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid and continues to pay claims that would not be paid but for Defendants' false and illegal conduct, and has been damaged as a result.

80.     As set forth in the preceding paragraphs, Defendants have knowingly violated 31 U.S.C. Section 3729(a)(1) and (a)(2), and has thereby damaged, and continues to damage, the United States Government by its actions in an amount to be determined at trial.

## COUNT II
## REVERSE FALSE CLAIMS UNDER 31 U.S.C. § 3729

81.     Relator  realleges  and  incorporates  by  reference  the  allegations

contained in the preceding paragraphs of this Complaint.

82.     By and through the acts described herein, Defendants knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States or to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States, to wit:

a.      Defendants knew that they had received millions of dollars in home health PPS payments for patients who did not qualify for the Medicare home health benefit, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

b.      Defendants knew that they had received millions of dollars in home health payments that were fraudulently inflated by false patient OASIS assessment information, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

c.      Defendants' actions described herein have resulted in damage to the United States equal to the amount of money withheld by Defendants

in derogation of its obligations to refund the United States.

## COUNT III
## CONSPIRACY UNDER 31 U.S.C. § 3729

83.     Relator realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

84.     Defendants, in concert with its principals, agents, employees, and other institutions, namely Trilogy Physician Services, LLC, did agree to submit the false claims described herein to the United States, and the United States in fact paid those false claims. Likewise, Defendants, in concert with its principals, agents, employees, and other institutions did agree to reduce its obligations to the United States through the pattern and practice of reverse false claims described herein.

85.     Defendants and its principals, agents, and employees acted, by and through the conduct described herein, with the intent to defraud the United States by submitting false claims to the United States through Medicare and Medicaid and through a pattern and practice of fraudulently withholding money from the United States through reverse false claims.

## COUNT IV
## SUPPRESSION, FRAUD, AND DECEIT

86.     Relator realleges and incorporates by reference the allegations contained in the preceding paragraphs of this Complaint.

87.     Defendants misrepresented or suppressed the material facts that: (1)

that the purported cost of its patient care was exaggerated through OASIS manipulation; (2) that it had failed to perform certain services for which it was paid; (3) that it performed services that were unauthorized and unnecessary or provided to ineligible patients; and (4) that the Defendants engaged in unlawful self-referrals.

88.    Defendants were legally obligated to communicate these material facts to the United States.

89.    Such misrepresentations were made willfully to deceive or recklessly without knowledge.

90.    The United States acted on Defendants' material misrepresentations described herein to their detriment.

91.    Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid by the United States to Defendants as a result of Defendants' fraudulent claims.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator respectfully asks that this Court:

a.    Enter a preliminary and thereafter a permanent injunction enjoining the Defendants from violating 31 U.S.C. § 3729 et. seq.;

b.    That this Court enter judgment against the Defendants in an amount equal three times the amount of damages the United States Government has

sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $10,000 for each violation of 31 U.S.C. §3729, and the costs of this action, with interest, including the costs to the U.S. Government for its expenses related to this action;

c.      That, in the event the U.S. Government continues to proceed with this action, the Plaintiff-Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of this action or the settlement of the claim;

d.      That, in the event the U.S. Government does not proceed with this action, the Relators be awarded an amount that the Court determines is reasonable for collecting the civil penalty and damages, which shall be not less than 25% nor more than 30% of the proceeds of this action or the settlement of the claim;

e.      That this Court enter judgment against Defendants in an amount equal to twice the economic damages Relator has suffered, plus full damages for the Relator's mental anguish, suffering and humiliation, including damages for future lost wages and benefits as a result of the unlawful constructive discharge of their employment with Defendant and other retaliatory action in violation of 31 USC § 3730(h);

f.      That Relator be awarded all costs incurred in this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d);

g.     That Relator be awarded pre-judgment interest; and

h.     That the United States Government and the Relator be granted all such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

_____Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated this 7th day of February, 2019.

Respectfully submitted,

_____
Scott Morro (ASB-4954-C30M)
Attorney for Plaintiff-Relator
Morro Law Center, LLC
P.O. Box 1644
Gardendale, AL  35071
(205) 631-6301 (office)
morrolawcenter@bellsouth.net

**FILED IN CAMERA AND UNDER SEAL**
**DO NOT SERVE DEFENDANTS**

**CONFIDENTIAL SERVICE BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED TO:**

On this the 7th day of February, 2019, Relator hereby certifies a true and correct copy of the foregoing Complaint was filed under seal with the Clerk of Court. A copy of same is being placed in the U.S. mail, postage prepaid, to the following counsel of record:

Jay E. Town
United States Attorney
Northern District of Alabama
1801 4th Ave North
Birmingham, AL 35203

Matthew G. Whitaker
Attorney General of the United States
Department of Justice
950 Pennsylvania Ave NW
Washington, D.C. 20530

_____
Scott Morro (ASB-4954-C30M)
Attorney for Plaintiff-Relator