# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ex rel. **ERIN HORSLEY,** | }<br>}<br>} |
| **Plaintiffs,** | }<br>} |
| v. | } Case No.: 2:19-CV-00229-RDP<br>} |
| **COMFORT CARE HOME HEALTH, LLC; et al.,** | }<br>}<br>} |
| **Defendants.** | } |

## MEMORANDUM OPINION

This case involves a *qui tam* action filed by Plaintiff-Relator Erin Horsley ("Relator" or "Horsley") against Defendants Comfort Care Home Health, LLC, Woodland Home Health Services-CRMC, LLC, Trilogy Physical Services, LLC, Jonathan James, Alan Stewart, and Steve Carmen. (*See* Doc. # 1). She asserts claims under the False Claims Act. *See* 31 U.S.C. § 3729. Horsley originally filed this action, but the United States thereafter intervened pursuant to its authority under 31 U.S.C. § 3730(c)(2). After doing so, it reached a proposed settlement with Defendants, and has now filed two motions: one asking the court to find the proposed settlement is fair, adequate, and reasonable (Doc. # 21); and the other seeking dismissal of all unreleased claims (Doc. # 22). Horsley opposes the motions. The motions are fully briefed (Docs. # 26, 27, 32). After careful consideration, the court concludes that both motions (Docs. # 21, 22) are due to be granted.

**I.      Background**

This case stems from claims that several home health care companies engaged in Medicare fraud. Because the procedural history of this case is complex, the court has divided the "Background" portion of this opinion into three sections. The court first reviews the legal background of this case, including an overview of the False Claims Act and the relevant Medicare reimbursement processes applicable to home health care companies. The court then discusses the factual background of this case, including the parties' relationships with one another. Finally, the court details the relevant procedural background of this action, beginning with the filing of Plaintiff-Relator's complaint through the government's decision to intervene and eventually settle the case with Defendants.

**A.      Legal Background**

The False Claims Act ("FCA") is a federal statute that prohibits any individual or entity from knowingly submitting a false or fraudulent claim to the government for compensation or approval, or knowingly making, using, or causing to be made or used, a false record or statement that is material to a false or fraudulent claim. *See* 31 U.S.C. §§ 3729(a)(1), 3729(a)(1)(A)-(B). The FCA also forbids anyone from concealing or circumventing any obligation to remit money back to the federal government. 31 U.S.C. § 3729(a)(1)(G). The terms "knowing" or "knowingly" are defined in the Act and they cover any individual who, with regards to material information: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b).

Recognizing that the government will not always be able to detect or protect against fraud, Congress authorized private parties to bring claims on behalf of the government. "In a *qui tam*

action, [a] relator pursues the government's claim against the defendant, and asserts the injury in face suffered by the government." *United States ex rel., Farmer v. Honduras*, No. 17-00470-KD-N, 2020 WL 496509, at *5-6 (S.D. Ala. Jan. 30, 2020) (internal quotation marks and citations omitted), *appeal docketed*, *United States v. McAvoy*, No. 20-10604 (11th Cir. Feb. 18, 2020). The United States remains the real party in interest. *United States v. Everglades Coll., Inc.*, 855 F.3d 1279, 1289 (11th Cir. 2017). "In bringing a qui tam action the relator in effect su[es] as a partial assignee of the United States." *Id.* (bracketed text in original). "If the United States decides to intervene, the government acquires 'primary responsibility for prosecuting the action,' although the relator remains a party" to the action. *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1086-87 (11th Cir. 2018) (internal quotation marks and citations omitted), *cert. granted sub nom. Cochise Consultancy, Inc. v. U.S. ex rel. Hunt*, 139 S. Ct. 566 (2018), *aff'd*, 139 S. Ct. 1507 (2019).

Relevant to this action, the government (as part of the Medicare program) will pay for certain home health services, including part-time or intermittent skilled nursing care, speech-language pathology, physical or occupational therapy, part-time or intermittent skilled home health-aid services, and medical social services. *See* 42 U.S.C. §§ 1395d(a)(3), 1395k(a)(2)(A), 1395x(m). To receive Medicare reimbursement, when creating a patient's plan of treatment, a physician must also certify that the patient meets a certain set of coverage requirements. 42 C.F.R. § 424.22. That is, the physician must certify that: (1) the patient needs the particular type of home health service; (2) the patient was non-ambulatory or homebound (except when receiving outpatient services) and therefore needs the home health service; (3) the patient's treatment plan for home health services has been established and will be periodically reviewed by a licensed physician; and (4) that the home health service was administered to the patient while under the

care of a licensed physician. *See* 42 C.F.R. §§ 424.22(d), 424.22(a)(1); *see also* 42 U.S.C. § 1395n(a). Additionally, the physician reviewing the patient's treatment plan must recertify every sixty-days that the patient still needs the home health services, and must provide an as to estimate how much longer the patient will require the services. *See* 42 C.F.R. § 424.22(b)(1)-(2). If the home health agency transfers or discharges a patient, and the patient returns to the same home health agency, recertification must occur during the first sixty days. *See* 42 C.F.R. § 424.22(b)(1).

### B.     Factual Background

Defendant Comfort Care Home Health, LLC ("Comfort Care") manages a number of home health agencies in Alabama including Defendant Woodland Home Health Services-CRMC, LLC ("Woodland"). (Doc. # 26 at ¶ 2). Comfort Care is also a partial owner of Woodland. (*Id.*). Trilogy Physician Services, LLC ("Trilogy") provides physician home visits for non-ambulatory patients. (Doc. # 26 at ¶ 4). Defendant Alan Stewart ("Stewart") was a partial founder and owner of Trilogy. (*Id.*). In 2017, he sold his ownership interest in Trilogy and was named COO of Comfort Care. (*Id.*). Defendant Steven Carman ("Carman") is a regional administrator of Comfort Care, and Defendant Jonathan James ("James") is the agency administrator of Woodland. (Doc. # 26 at ¶ 2).

Horsley[1] worked as a licensed nurse for Comfort Care. (Doc. # 1 at ¶ 5). She claims that Defendants' business practices were designed to "fraudulently maximize billing to the United States by falsely representing the type and severity of patients' medical conditions." (*Id.*). For example, Horsley asserts that she witnessed countless examples of Comfort Care fraudulently inflating its Medicare billing by amplifying the severity of the patient's medical condition and need for home health services, through a process known as "upcoding." (Doc. # 1 at ¶ 34). Specifically, she alleges that Comfort Care engaged in upcoding at two different levels. (Doc. # 1

---

[1] In *qui tam* lawsuits, the court generally refers to Plaintiff-Relator as simply "Relator," so the court will continue with tradition in this memorandum opinion.

at ¶ 44). First, Comfort Care provided medically unnecessary home health services by falsely certifying that patients needed a higher level of care than they actually did. (*Id.*). Second, Comfort Care recertified patients' treatment plans to continue providing home health services, even when they were no longer necessary for the patient. (*Id.*).

  **C.**  **Procedural Background**

On February 7, 2019, Horsley filed her complaint on behalf of the government against Comfort Care, Woodland, Trilogy, Stewart, Carman, and James (collectively "Defendants"). (Doc. # 1 at ¶ 2). Specifically, Horsley alleged that Defendants violated the FCA by upcoding the severity of patients' conditions, providing medically unnecessary therapy services to patients, recertifying patients who did not need home-health services, improperly "checking-in" new orders for home-health services, and, on at least one occasion, billing for work that was not actually performed. (Doc. # 26 at ¶ 3). Horsley also alleged that Woodland automatically assigns patients to Trilogy without the patients' consent, even if Trilogy's services for those patients were not medically necessary. (*Id.* at ¶ 5).

After Horsley's complaint was received by the government, it began an analysis of the relevant Medicare claims and data. (Doc. # 26 at ¶ 6). The government pulled Medicare Part A claims[2] for Woodland and four other Comfort Care home-health agencies to compare recertification rates. (*Id.*). The government also pulled the Medicare Part B claims for individuals who received home-health services from Woodland in order to find providers, not associated with Comfort Care and Woodland, who could attest to the medical status of the patient beneficiaries. (*Id.* at ¶ 7). The Medicare Part B claims provided the government with a way to check the home-health diagnoses with other treatment diagnoses for consistency. (*Id.*). Finally, the government

---

[2] Medicare Part A claims are submitted by a home-health services agency for reimbursement. *See* 42 U.S.C. § 1395(d).

5

viewed Medicare claims from Trilogy to discover the number of patients who received services from both Trilogy and Woodland, by which they could ascertain the amount of money paid by Medicare to Trilogy for those patients. (Doc. # 26 at ¶ 8).

The government conducted approximately nineteen witness interviews and served a number of investigative demands and interrogatories on Comfort Care and Woodland. (Doc. # 26 at ¶ 9). In response, the companies submitted around 47,000 pages of documents. (*Id.*). The government and several consulting experts reviewed the submissions and found the medical records of twenty-five beneficiaries who received services from Woodland. (*Id.* at ¶ 10). These twenty-five patients were chosen by the government based on claims data and medical provider interviews. (*Id.*). Then, medical experts evaluated the medical necessity of home-health care for each of those twenty-five beneficiaries. (*Id.* at ¶¶ 10-11).

Toward the end of their investigation, the government's team presented a portion of their findings to Woodland and Comfort Care's defense counsel. (Doc. # 26 at ¶ 12). This presentation precipitated an extensive series of negotiations, which eventually led to a settlement agreement. (*Id.* at ¶ 13). According to the agreement, Woodland and Comfort Care agreed to pay the government $704,999.26, but not admit liability. (Doc. # 26-1 at ¶¶ 1-2). The government agreed to release the two companies from claims the government may have had under the FCA, or any other statute, based on the scope of alleged conduct. (*Id.*). As part of the resolution, Comfort Care and Woodland also insisted the *qui tam* suit be dismissed. (*Id.* at ¶ 3).

Based on the terms of the settlement agreement, the government filed motions under 31 U.S.C. § 3730(c)(2) to dismiss all unreleased claims and asked the court to find the proposed settlement is fair, adequate, and reasonable. (Docs. # 21, 22). In opposition, Horsley argues: (1) that the government failed to articulate a reasonable basis for settlement, or failed to show that she

would not be unfairly prejudiced by the settlement; and (2) that the government neglected to provide a rational and valid basis for dismissal of the claims against Comfort Care's other agencies and Trilogy Physician Services, LLC. (Doc. # 27 at 2-6, 9-15).

## II.     Discussion

The court first addresses the government's request that it find the proposed settlement is fair, adequate and reasonable. (Doc. # 21). The court then turns to the government's motion to dismiss unreleased claims. (Doc. # 22).

### A.     The Proposed Settlement Is Fair, Adequate, and Reasonable

Under the FCA, the government "may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." 31 U.S.C. § 3730(c)(2)(B). In evaluating whether this settlement is fair, adequate, and reasonable, the court is mindful of the Eleventh Circuit's standard, which requires this court to ask, among other things, "whether the government has advanced a reasonable basis for concluding the settlement is in the best interests of the [government], and whether the settlement unfairly reduces the relator's potential *qui tam* recovery." *Everglades Coll.*, 855 F.3d at 1289. District courts must give considerable deference to the settlement rationale proffered by the government because the relator brings a *qui tam* action merely "as the assignee of the United States' claim[.]" *Id.* at 1288. The government is the real party in interest to FCA actions. *Id.*

In its brief, the government argues that: (1) the proposed settlement amount of $704,999.26 represents a large recovery (both in absolute and in relative terms) (Doc. # 26 at 9-10); (2) the government values the certainty derived from a settlement (*Id.* at 11); and (3) from an opportunity-cost standpoint, the settlement is appropriate because the United States Attorney's Office for the

Northern District of Alabama has multiple, open healthcare fraud investigations and cannot afford to direct all of its resources to this case alone. (*Id.* at 12). The government also contends that the proposed settlement does not unfairly reduce Horsley's potential *qui tam* recovery, particularly given that the certainty of a settlement *guarantees* that she will recover some monetary recovery. (*Id.* at 12-13). That is, the government correctly notes that if the case were to proceed to trial, there is a potential that she could recover nothing. (*Id.*).

In her response, Horsley opposes the settlement, claiming that it negatively affects her *qui tam* recovery for several reasons.[3] First, she claims that the settlement amount, "a six[-] figure sum of over $700,000," is not reasonable because the government has not yet participated in discovery. Horsley points to two cases where the government did not settle a case until after the discovery process. *See Everglades Coll.*, 855 F.3d at 1289; *United States ex re. Balko v. Senior Home Care, Inc.*, No. 8:13-CV-03072-EAK-TBM, 2017 WL 3268200, at *3 (M.D. Fla. Aug. 1, 2017). However, those two cases are easily distinguishable from this situation.

In *Everglades*, the government intervened on appeal and settled with the defendants for $335,000, after the plaintiff-relators only recovered $11,000 at trial. 855 F.3d at 1284. The government's settlement was deemed reasonable because the recovery was much greater than the verdict at trial. *Id.* at 1289. Here, Horsley argues that the settlement in *Everglades* was reasonable because the government had the benefit of discovery and a full trial on the merits before deciding to intervene and settle, and she maintains that the government should follow the same procedural

---

[3] Both of Horsley's arguments seemingly hint that she believes a larger recovery is possible if the case proceeds at trial, as she values the case at $56,305,656.00. (Doc. # 27 at 7). However, the government forecasts that it could recover only $256,258.80 with a verdict in its favor at trial. (Doc. # 26 at 10 n.7). *See Everglades Coll.*, 855 F.3d at 1289 (affirming the district court's approval of a $335,000 settlement when relator valued the case in the billions of dollars).

path as in *Everglades*: only settle after trial if her recovery does not correspond with what she contends to be the merits of the case.

Horsley also relies on *Senior Home Care* in support of her position that the government should wait until after discovery is complete to decide to settle this case.[4] 2017 WL 3268200, at *1. Horsley maintains that if the government waited until after discovery is complete to decide about settlement, that would allow the government to properly evaluate her theory of liability and assess the likelihood of success in trial. She also contends that any settlement with Defendants cannot be deemed reasonable because the government cannot evaluate the merits of the case without the benefit of discovery. But, Horsley's arguments and her reliance on *Everglades* and *Senior Home Care* are misplaced.

The reasonableness of the government's decision to settle a matter does not necessarily depend on whether the settlement maximizes the monetary recovery for the parties. *See Everglades Coll.*, 855 F.3d at 1289. Rather, what Horsley neglects to acknowledge is that, in both *Everglades* and *Senior Home Care*, the government was not required to bear the cost of discovery. Denying the government's motion and forcing it to expend resources on discovery and further litigation activity would ignore the reasonable bases for settlement articulated by the Eleventh Circuit in *Everglades*. *See Id.* (determining that the government's desire to avoid expending resources on a case as it moves through the trial and appellate processes, as well as valuing the certainty of settlement versus the uncertainty of appeal, are reasonable bases for settlement). Additionally, Horsley's argument that her potential *qui tam* recovery will be unfairly reduced by the government's proposed settlement is without merit. *See Id.* (recognizing that a relator's potential

---

[4] In *Senior Home Care*, the government became involved because it believed that the relator's case was "tenuous." 2017 WL 3268200, at *3. The government believed that the relator's theory of liability suffered from legal and factual flaws which would lead to a verdict in favor of the defendant at trial. *Id.*

9

*qui tam* recovery is not unfairly prejudiced when she is guaranteed a monetary recovery via settlement).

Horsley also contends that her potential *qui tam* recovery would be unfairly prejudiced because the government failed to extrapolate the Medicare claim data beyond Comfort Care's Woodland location. To emphasize this point, she cites to a number of situations in which data extrapolation was an appropriate vehicle for calculating damages in FCA cases. *See, e.g., United States v. AseraCare, Inc.*, 938 F.3d 1278 (11th Cir. 2019) (determining that further liability could be imposed upon Defendant for a statistically valid set of additional claims after extrapolating data from a sample of 233 patients from an initial claim set of 2,181). But she has not cited to a single case (or any other legal authority) that requires discovery and/or data extrapolation before the parties may reach a FCA settlement. Instead, Horsley has merely shown that discovery and data extrapolation have been used by parties in other suits before reaching a settlement agreement.

The court is satisfied the government has done its homework and reasonably assessed the value of this settlement. The court is also confident that the government has determined it is best to settle this case now, before incurring the significant costs of protracted litigation that would cause it to expend valuable resources, reduce the value of a settlement, and potentially affect Defendants' ability and willingness to settle. Upon review of the arguments and the relevant case law, this court concludes that the government has shown a reasonable basis for settlement; the settlement is fair, adequate and reasonable; and that the agreement does not unfairly reduce Horsley's potential *qui tam* recovery under 31 U.S.C. § 3730(c)(2)(B).

### B.     The Dismissal of All Unreleased Claims Is Appropriate

The government also seeks to dismiss all unreleased claims against Defendants pursuant to the terms of the settlement agreement. (Doc. # 26 at 14). The record suggests that the

government's agreement to dismiss those claims was a material term of the parties' proposed settlement. That is, but for the government's agreement to that particular term, Defendants would not have settled. The government may dismiss any unreleased claims under the FCA "notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A).

The Eleventh Circuit has construed the statutory right to a hearing not to require an actual hearing, but to "include no more than a right to highlight existing evidence and make arguments based on that evidence, that the proposed settlement in unreasonable or improper." *Everglades Coll.*, 855 F.3d at 1290; *Martin v. United States Dep't of Agric.*, No. CV 118-009, 2019 WL 166554, at *3 (S.D. Ga. Jan. 10, 2019) ("[T]he Court finds that it is unnecessary to hold a hearing in this case before granting the Government's motion to dismiss."). Notably, Horsley has not expressly (or for that matter, even impliedly) requested a hearing. *Chang v. Children's Advocacy Ctr. of Delaware*, 938 F.3d 384, 387 (3d Cir. 2019), *appeal docketed*, No. 19-1312 (U.S. March 16, 2020) ("An 'opportunity for a hearing,' however, requires that relators avail themselves of the 'opportunity.'"). Nor has Horsley made a colorable showing of arbitrary governmental decision making. *See, e.g.*, *Sequoia Orange*, 151 F.3d at 1145 ("A hearing is appropriate 'if the relator presents a colorable claim that the settlement or dismissal is unreasonable in light of existing evidence, that the Government has not fully investigated the allegations, or that the Government's decision was based on arbitrary or improper considerations.'" (quoting S. Judiciary Comm., False Claims Amendments Act of 1986, S. Rep. No. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291)); *cf. Swift*, 318 F.3d at 251 (noting that the district court held a hearing when the relator "opposed dismissal and requested a hearing"). Without question, she has been

11

given the opportunity to highlight evidence and make arguments based on that evidence in her briefing. (Doc. # 27). Accordingly, this dispute is ripe for resolution.

In support of its motion, the government argues that pursuit of these claims (either by the government or Horsley) is unlikely to result in any meaningful recovery for either party.[5] (Doc. # 26 at 14-15). There is a circuit split as to whether 31 U.S.C. § 3730(c)(2)(A) gives the government an "unfettered right" to dismiss any unreleased claims, or whether the government is required to show both a valid purpose and a rational relationship between dismissal and accomplishment of that valid purpose. *Compare Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003) (granting the government an "unfettered right" to dismiss unreleased claims in a *qui tam* action), *with United States ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp.*, 151 F.3d 1139, 1145) (9th Cir. 1998) (requiring the government to meet the valid purpose and rational relationship standard), *and United States ex rel. Ridenour v. Kaiser-Hill Co., LLC*, 397 F.3d 925, 934-35 (10th Cir. 2005) (also adopting the valid purpose and rational relationship standard).

The Eleventh Circuit has not expressly articulated which standard applies in a dispute like this. But, it has stated, in dicta, that "[w]hen the government seeks to dismiss the FCA action [as opposed to settling], the statute does not prescribe a judicial determination of reasonableness . . . ." *Everglades Coll.*, 855 F.3d at 1288. A well-respected judge in the Southern District of Alabama has construed this language to mean that the *Swift* standard governs § 3730(c)(2)(A) dismissals in this Circuit. *See United States ex rel., Farmer*, 2020 WL 496509, at *5-6 (concluding that the *Swift* standard governs and holding that the United States has the unfettered right to dismiss *qui tam* actions); *see also United States ex rel. Ayers v. BondCote Corp.*, No. CV403-011, 2004 WL

---

[5] The government provides a detailed breakdown of any likely recovery if, instead of settling, it filed a complaint in intervention, completed discovery, survived Defendants' likely motions for summary judgment, obtained a favorable jury verdict at trial, and the court imposed the maximum FCA penalty. (Doc. # 26 at 10). The government estimates that the maximum recovery, with treble damages and penalties, would likely be $256,258.80. (*Id*. at 10 n.7).

7330782, at *4 (N.D. Ga. Aug. 20, 2004) ("[U]nder the terms of the statute, the Court may grant the Government's motion to dismiss claims in this lawsuit without a finding that the dismissal is fair adequate and reasonable. As long as Relator has been given notice and an opportunity for a hearing, the Court can dismiss claims upon the Government's motion."). *But cf. United States ex rel. Graves v. Internet Corp. for Assigned Names & Numbers, Inc.*, 398 F. Supp. 3d 1307, 1310 (N.D. Ga. 2019) ("[T]he Government's discretion to dismiss a case is not entirely 'unfettered,' as the *Swift* court decided.").

Here, the court believes that the Eleventh Circuit would adopt the D.C. Circuit's *Swift* standard in a manner consistent with the analysis of Judge Steele in *Farmer*. However, even if that were not the case, Horsley's objections still fail, even under the more restrictive *Sequoia Orange* standard articulated by the Ninth Circuit. The government asserts that, for the following reasons, there are valid purposes rationally related to dismissal of the unreleased claims under *Sequoia Orange*: (1) the government's desire to conserve resources; (2) the government's aim to avoid the risk of the creation of adverse case law; and (3) the reality that resolving Relator's *qui tam* action is an express condition of the settlement agreement between the government and Defendants. The Eleventh Circuit has squarely held that the first two factors constitute valid governmental purposes that are rationally related to the dismissal of unreleased claims. *See Everglades Coll.*, 855 F.3d at 1289 ("And most importantly for the United States here, the government must be wary of the precedential impact of a potentially adverse appellate decision. If the Eleventh Circuit affirmed the district court's restrictive reading of the FCA here, the government would be limited in its enforcement efforts all around the Circuit."); *see also Graves*, 398 F. Supp. 3d at 1311 (holding that there is a rational relationship between the government's desire to conserve resources, by not monitoring a potentially meritless claim, and dismissal). In light of the reasons articulated by the

government, this court is satisfied that the government has shown valid purposes rationally related to its motion to dismiss.

Further, even assuming application of the *Sequoia Orange* standard, Judge May's approach in *Graves* is a sensible one. Once the government has demonstrated a valid purpose rationally related to dismissal, the burden shifts to the nonmoving party to show that dismissal is fraudulent, arbitrary and capricious, or illegal. *Graves*, 398 F. Supp. 2d at 1311-12 (citing Sequoia Orange, 151 F.3d at 1145). "The standard of review is deferential to preserve the traditional authority of the executive branch to make policy choices about the litigation it pursues." *Graves*, 398 F. Supp. 2d at 1312 (quotations omitted).

Horsley contends that the unreleased claims should not be dismissed because: (1) the government's investigation was inadequate; (2) the government mischaracterized (or misunderstood) Alan Stewart's role within the Trilogy corporate scheme; and (3) no adverse case law would be created because this case would not require a "battle of the experts." However, none of these arguments support her legal contention that dismissal of the unreleased claims would be fraudulent, arbitrary and capricious, or illegal in any way. *See, e.g., United States v. Academy Mortgage Corp.*, No. 16-cv-02120-EMC, 2018 WL 4794231, at *4 (N.D. Cal. Oct. 3, 2018) (denying the government's motion to dismiss *qui tam* action because the relator proffered evidence that the government sought to drop the lawsuit without any investigation into an amended complaint). *See also United States v. Gilead Sciences., Inc.*, No. 11-cv-00941-EMC, 2019 WL 5722618, at *8 (N.D. Cal. Nov. 3, 2019) (determining that the government's motion to dismiss was not fraudulent, arbitrary and capricious, or illegal because: (1) the government had never been dismissive of the relators' FCA claim; (2) the government had been involved in the case for nine

years; and (3) the relators could not show that the government consistently failed to take *qui tam* complaints seriously or that there was a pattern of moving to dismiss).

After careful review, the court concludes that the government has the right to settle this case on its (and these) terms. Alternatively, after a thorough examination of the record and the relevant case law, the court finds that the government has demonstrated a valid purpose that is rationally related to dismissal of the unreleased claims, and that Horsley has not shown that dismissal of these claims would be fraudulent, arbitrary and capricious, or illegal.[6] Therefore, the government's motion to dismiss all unreleased claims is due to be granted.

### III. Conclusion

The court concludes the government's motions to find the proposed settlement as fair, adequate, and reasonable (Doc. # 21) and to dismiss all unreleased claims (Doc. # 22) are both due to be granted. A separate order consistent with this memorandum opinion will be entered.

**DONE** and **ORDERED** this July 15, 2020.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE

---

[6] In her briefing, Relator requests the opportunity to leave and amend her complaint under Federal Rule of Civil Procedure 15, *if* the court were to deny the government's motion to dismiss all unreleased claims, to include a separate claim for retaliation under the FCA. *See* 31 U.S.C. § 3730(h)(1). However, this request is now moot as the motion to dismiss all unreleased claims is due to be granted.